NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200249-U

NO. 4-20-0249

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Macon County |
| ELLIOTT T. MURPHY, | ) | No. 09CF1471 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The record does not show the sentencing court improperly considered an
               element of the offense, the victim's death, as an aggravating factor.

               (2) The trial court did not abuse its discretion in sentencing defendant.

¶ 2     In April 2017, defendant, Elliott T. Murphy, was found guilty of the August 2009

first degree murder of Jerry Newingham (720 ILCS 5/9-1(a)(1) (West 2008)) and attempted first

degree murder of Kevin Wilson (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)). Defendant, born

April 5, 1993, was 16 years old at the time of the offenses. He was sentenced to consecutive

prison terms totaling 55 years. On appeal, this court reversed the sentence and remanded for

resentencing upon finding the sentencing court's determination defendant possessed

rehabilitative potential precluded defendant's *de facto* life sentence. See *People v. Murphy*, 2019

IL App (4th) 170646, ¶ 48.

¶ 3        On remand, the trial court resentenced defendant to an aggregate 39½-year sentence. Defendant was sentenced to 31 years in prison for murder and 8½ years in prison for attempted murder. Defendant appeals the sentence, arguing the trial court erred by (1) relying on a factor inherent in the offense of murder as an aggravating factor for sentencing and (2) failing to correctly apply the juvenile sentencing factors. We affirm.

¶ 4                            I. BACKGROUND

¶ 5        On August 24, 2009, Jerry Newingham and Kevin Wilson, in two separate incidents, were attacked by a group of teenage males. According to the State's evidence, this group of males included defendant, defendant's younger brother Deonta Johnson, Dedrick Rhone, Fredrick Rhone, Malcolm Spence, and Branden White. Newingham, age 61, was riding a bicycle when he was attacked. He was knocked from his bicycle and then was stomped to death. A short time later, members of the group attacked Wilson.

¶ 6        The members of the group were juveniles whom the State prosecuted as adults for various offenses including the first degree murder of Newingham and attempted murder of Wilson. White entered a negotiated plea to first degree murder by which he agreed to testify truthfully. He was sentenced to 20 years in prison. Spence entered a negotiated plea. According to his plea, the murder and attempted murder charges were dismissed upon Spence's agreement to plead guilty to mob action and obstruction of justice and to testify truthfully. Fredrick entered an open plea of guilty to murder and was sentenced to 20 years in prison. Dedrick entered an open plea to the attempted murder of Wilson and was sentenced to 15 years in prison.

¶ 7                          A. Trial Proceedings

¶ 8        Defendant elected to be tried by a jury. At his first trial, defendant was tried jointly with his brother. Both were found guilty of murder (Newingham) and attempted murder

- 2 -

(Wilson). Defendant was sentenced to consecutive prison terms of 55 years and 25 years. Defendant appealed his convictions. This court reversed, upon finding trial counsel had a "*per se* conflict of interest in contemporaneously representing defendant and [a witness]." *People v. Murphy*, 2013 IL App (4th) 111128, ¶ 79, 990 N.E.2d 815.

¶ 9        Defendant's second jury trial was held in April 2017. Evidence from the trial established on August 24, 2009, shortly after 4 p.m., emergency personnel found Newingham lying unresponsive near 540 West Sawyer Street in Decatur, Illinois. He had scrapes on his forehead and face. Newingham "was still kind of tangled up in his bicycle." Witnesses observed a group of six to nine male teenagers split up and then run or walk in different directions from where Newingham was found. Newingham was transported to the hospital. When he arrived, Newingham was bleeding from his nostrils and had swelling around his left eye and ear. He remained on life support until September 5, 2009. He died when life support was removed. Newingham's cause of death was blunt head trauma from an assault.

¶ 10        Approximately one hour later, emergency personnel responded to Garfield Park, where Wilson was found. Wilson was "semi-conscious, groaning and moaning." He was unable to answer basic questions and was unable to walk. His face was "[p]retty bloody and battered, swollen." Wilson was transported to the hospital and was treated for multiple facial fractures, "primarily cheek bones and the eye sockets as well as the maxillary sinuses." He was placed on a ventilator and had a feeding tube. Wilson's injuries were consistent with blunt force trauma. He was discharged from a rehabilitation hospital on September 18, 2009.

¶ 11        The State called multiple witnesses to testify regarding the events. According to the testimony, Cedrick Rhone and Brian Armour got into a fight after school in Garfield Park. Defendant observed the fight, as did "a bunch" of others, including Johnson, Fredrick, Dedrick,

and White. Spence and Martin Wheeler also may have been there. "Everyone" scattered when the police arrived. A group later encountered Newingham as Newingham rode his bicycle on Sawyer Street.

¶ 12        There are multiple versions of the attack on Newingham and Wilson. Although the versions differ in some degree, the State's witnesses testified or made statements to police showing defendant participated in the attack of Newingham. Wheeler testified, when Newingham was spotted, Johnson ran up to Newingham, hit him, and knocked him off his bicycle. Defendant, Fredrick, and Dedrick joined Johnson and stomped on Newingham. According to Wheeler, defendant stomped on Newingham four times. Wheeler acknowledged, however, testifying earlier he believed it was 10 times and that when he was interviewed by the police about a month after the attack, he said defendant stomped Newingham about 27 times. Cedrick testified he could not remember what happened to Newingham. In a videotaped police interrogation, however, Cedrick stated Johnson asked defendant if he should knock out Newingham. Johnson then ran up to Newingham and struck him. Defendant then stomped on Newingham's head. When he was asked if he recalled telling police defendant stomped on Newingham's head 30 to 40 times and "did it all," Cedrick stated he did not. White testified he did not remember what happened. White had testified in two previous court proceedings. In one or both of those proceedings, White testified Johnson punched Newingham and defendant, Johnson, and Fredrick stomped on Newingham. Spence testified he was not present during the encounter with Newingham. He testified defendant told him a couple of days after the attack that Johnson had punched Newingham after defendant told him to do so. Defendant also told Spence he stomped on Newingham.

¶ 13        Defense witnesses, twin brothers Fredrick and Dedrick, testified defendant did not

participate in the attack. Fredrick testified he, White, and a third person Fredrick did not know were responsible. According to Fredrick, White initiated the attack when Fredrick was not looking. Fredrick did not know who the man "that's laid out" was, so he joined his friend in attacking Newingham. Defendant, who had been walking with the group just ahead of Fredrick, did not join in the attack. Dedrick testified White and Fredrick approached Newingham. He did not know who threw the first punch. Dedrick then observed Spence, Martez Hill, Allen Hill, and Wheeler participate in the attack. Dedrick testified defendant was not involved in the attack as defendant had stopped about a block away to talk to others.

¶ 14          After Newingham was attacked, Cedrick and Armour got into another fight. It was observed by largely the same group who observed the earlier fight. After the fight, the observers broke up. Some went to Garfield Park, where Wilson was attacked.

¶ 15          The State called several witnesses regarding the attack on Wilson. Wheeler testified he was with the group that went to Garfield Park. Wheeler believed Johnson was the first to walk up to Wilson, who was sitting, and hit him. Defendant then hit Wilson in the face, causing Wilson to fall. Fredrick and Dedrick joined in, and all four stomped on Wilson. Spence testified defendant was the first to punch Wilson. Johnson, Fredrick, Dedrick, Cedrick, and White joined the attack. Cedrick denied remembering the events at Garfield Park. In his videotaped interrogation, however, Cedrick stated defendant hit Wilson and defendant, Spence, and White stomped on Wilson. When questioned about whether he remembered telling a police detective defendant repeatedly stomped on Wilson, including two or three times with both feet at once, Cedrick said he did not. Cedrick also did not recall telling the detective defendant "told everyone to get back" and then ran up and jumped on his head. White also denied remembering Wilson's attack, but White's testimony in previous proceedings revealed defendant, Johnson,

Dedrick, and Fredrick participated in the attack and defendant jumped on White's head with both feet. Shawn Stanley and Cadrekia Jackson testified they were present at the park when the attack occurred. Both denied remembering the events. However, statements made in their videotaped police interviews revealed both identified defendant as the initial attacker.

¶ 16       Defense witnesses Fredrick and Dedrick testified defendant was not involved in the attack on Wilson. Fredrick testified he headed to Garfield Park with Dedrick, Spence, and White, while defendant, Johnson, and Cedrick went in a different direction. Fredrick did not see the attack on Wilson as he fell behind the others. When Fredrick arrived at the park, the attack had already occurred, and Wilson was unconscious. Dedrick testified he first hit Wilson and then White, the Hill brothers, Spence, and Fredrick participated.

¶ 17       At the sentencing hearing, the trial court considered a presentence report. According to this report, defendant was raised by his mother and had no contact with his father. He had six siblings, with whom he maintained regular contact. Defendant had juvenile adjudications in 2006 and 2009 for knowingly damaging property and for robbery. Defendant was in the eleventh grade at the time of his arrest. He had no known learning disabilities. He had no concerns about his physical or mental health. Defendant denied having a substance abuse problem, but he began smoking marijuana around age 12 and continued to do so until his arrest.

¶ 18       The State presented evidence of a violent attack by defendant, then 18 years old, on a fellow inmate. The testimony showed two inmates had begun fighting when defendant became involved in their altercation. He repeatedly struck one of the inmates in his eye. Defendant was identified by a witness as the main aggressor. The inmate struck by defendant underwent surgery and ultimately lost his right eye.

¶ 19       Before imposing sentence, the trial court noted defendant was 16 years old at the

time of the offense. The court observed defendant "was mature enough and should have known what the risk and consequences of this behavior was." The court found defendant was not pressured to commit the offenses. Regarding the potential for rehabilitation, the court concluded "there is potential for rehabilitation in the future." The court sentenced defendant to consecutive terms of 40 years' imprisonment for first degree murder and 15 years' imprisonment for attempted first degree murder.

¶ 20     In his motion to reconsider, defendant argued his sentence was too harsh given his age and his minimal history of criminality. In deciding to deny the motion to reconsider, the trial court, in August 2017, made the following remarks:

> "Of course, the Court did consider factors in aggravation and
> mitigation, the statutory ones, along with the Court also considered
> the defendant's age, his level of maturity, outside pressures, home
> environment, his potential for rehabilitation, the circumstances of
> this offense, his degree of participation, his prior record."

¶ 21                          B. Initial Appeal

¶ 22     On appeal, defendant challenged his conviction and sentence. While this court upheld the conviction, we found defendant's *de facto* life sentence of 55 years was unconstitutional given the trial court's express finding of rehabilitative potential. *Murphy*, 2019 IL App (4th) 170646, ¶ 48.

¶ 23                          C. Resentencing

¶ 24     At the March 2020 resentencing hearing, the parties relied on the 2017 presentencing report. Defendant presented letters from his mother and sisters. The letters mentioned defendant's positive attitude and guidance. One sister wrote defendant's guidance

helped her be a better person and, because of that guidance, she was one year away from receiving her bachelor's degree in social work.

¶ 25    Defendant also made a statement in allocution. He apologized to the victims' families and to his own family for what they had to endure. Defendant stated he was not the same individual as when the incident occurred. He tried "everything" he could to better himself with the resources available to him. He was enrolled in classes for his GED. Because of his lengthy sentence, it took two years to get into that program. He hoped to be able to take college courses in the fall.

¶ 26    In closing argument, the State urged the trial court to comply with our decision in defendant's direct appeal and with *People v. Buffer*, 2019 IL 122327, ¶¶ 36-42, 137 N.E.3d 763, which held a sentence exceeding 40 years' imprisonment is a *de facto* life sentence, and sentence defendant to a total of 40 years. The State maintained such a sentence would ensure defendant would serve the most possible amount of time but remain consistent with *Buffer*.

¶ 27    Because the issues in the case turn largely on the language used by the trial court, the court's full analysis and sentence follow:

> "The court has considered statutory factors of aggravation, mitigation, the evidence that has been presented, the arguments of counsel, the statement of allocution.
>
> As I have stated previously, I've also looked at the pre-sentence report, looked at my notes from the trial, looked at my notes from the sentence hearing, along with the decision from the Appellate Court.
>
> First of all, as I look at factors in mitigation, [defendant]

- 8 -

has come to court today and apologized.

As I look at the other factors the court is to look at when sentencing an individual who is under the age of 18 at the time of the crime, I'll go through each one so there's no confusion.

The person's age was 16 at the time. The level of maturity—well, I see the level of maturity at this stage. I see the level of maturity at the time of the second trial. I was not the trial judge at the first one, but certainly the court does feel he was capable of understanding the risks and consequences of his behavior.

I did not see in the trial that he was subject to any outside pressure, including peer pressure, as stated. He was a leader in this situation, not a follower.

A person's family or home environment, education and social background, as I recall the evidence, he does come from a good family, good home environment. I'm not seeing anything in the home environment that would cause the court concern as to that.

As to the person's potential for rehabilitation, I did find that there was some rehabilitative potential in this case. I believe that's the reason the Appellate Court has sent this case back, because I did find some rehabilitative potential. He is getting his GED and has talked about going to college, so there is some rehabilitative

potential.

The circumstances of this offense—well, this was just a brutal act on innocent victims, who were not doing anything to deserve this type of actions, so I have considered the circumstances of the offense. I have considered the person's degree of participation and role in this offense. [Defendant] certainly was an active participant in this. He was not somebody who was a spectator sitting back.

I observed him during the trial. He was able to meaningfully participate in his defense. I've also looked at his juvenile and criminal history in this matter. At the time, he did have a juvenile case, 06-JD-143, for knowingly damaging property. He was put on court supervision on that. He had an 09-JD-41, a robbery conviction, as a juvenile, which he was placed on probation for. So I have looked at the statutory factors of mitigation.

As to the factors in aggravation, well, we already know we have two individuals, one who died as a result of [defendant's] actions; another person who was seriously injured. The court certainly can take that into consideration. I can take his criminal history into consideration, the need for a deterrent that Macon County will not tolerate violence on two innocent victims who were doing nothing wrong. Those are all factors the court has to

look at.

This was a horrific act by individuals. Certainly, the court does take a look at that. This is a non-probationable offense, so, once again, that's not something the court has to even take into consideration.

So as to a sentence on the first degree murder, I am going to sentence the defendant to the Illinois Department of Corrections for a period of 31 years. There will be a three-year mandatory supervised release on that.

As to Count 5, the attempt[ed] first degree murder, I do find that he inflicted serious bodily harm, so it is an 85 percent sentence. The murder is a hundred percent sentence for truth-in-sentencing. I am going to sentence him to the Illinois Department of Corrections on that for 8-1/2 years, for a total of 39-1/2 years in this case."

¶ 28    This appeal followed.

¶ 29                        II. ANALYSIS

¶ 30              A. Consideration of Improper Aggravating Factor

¶ 31    Defendant first argues the trial court erred when it considered in aggravation that defendant's conduct resulted in Newingham's death, a factor inherent in the murder for which he was convicted. Defendant concedes the error was not raised before the trial court but asks this court to consider the matter as plain error. The State counters the court's language only shows it could "take into consideration" Newingham's death but argues defendant has not met his burden

of showing the trial court in fact considered it in imposing defendant's sentence. The State maintains, because there was no error, the plain-error doctrine does not apply.

¶ 32    Under the plain-error doctrine, a reviewing court may provide relief from errors occurring during trial that were forfeited when not brought to the trial court's attention. See Ill. S. Ct. R. 615 (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Under the doctrine, a reviewing court may consider an unpreserved error if that error is "clear or obvious" and "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).

¶ 33    The first step in plain-error analysis is deciding whether clear or obvious error occurred. See *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Defendant carries the burden of showing clear or obvious error. *People v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. If defendant fails to meet that burden, the procedural error must be honored. *Hillier*, 237 Ill. 2d at 545. To warrant plain-error review, a sentencing error must be "sufficiently grave that it deprived the defendant of a fair sentencing hearing." *People v. Scott*, 2015 IL App (4th) 130222, ¶ 52, 25 N.E.3d 1257 (quoting *People v. Ahlers*, 402 Ill. App. 3d 726, 734, 931 N.E.2d 1249, 1256 (2010)).

¶ 34    A court, in general, may not use an element of the offense for which the defendant was convicted as an aggravating factor at sentencing. *People v. Phelps*, 211 Ill. 2d 1, 11-12, 809 N.E.2d 1214, 1220 (2004). This prohibition against "double enhancements" is based on the assumption the legislature considered that aggravating factor in determining the appropriate penalty range for that offense. *People v. White*, 114 Ill. 2d 61, 65-66, 499 N.E.2d 467, 469

(1986). This court should not affirm a sentence based on an improper factor unless we can determine from the record the weight placed on the improperly considered factor was so insignificant as to not lead to a greater sentence. *People v. Conover*, 84 Ill. 2d 400, 405, 419 N.E.2d 906, 909 (1981) ("Inasmuch as the trial court in each case improperly considered defendant's taking of proceeds as an aggravating factor in sentencing and because we cannot determine how much weight that factor was accorded, both cases must be remanded for reconsideration of the sentences."). We review the question of whether the trial court relied upon an improper factor *de novo*. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55.

¶ 35　　　　　Case law establishes a sentencing court, in cases where death is inherent in the offense, a trial court may rely on the factor the conduct threatened or caused serious harm (730 ILCS 5/5-5-3.2(a)(1) (West 2020)) if it finds aggravating the use of force employed by the defendant or the means by which the death was brought about. *People v. Saldivar*, 113 Ill. 2d 256, 271-72, 497 N.E.2d 1138, 1144 (1986). The sentencing court may not, however, rely on the mere fact the defendant caused death to increase a murder sentence as that factor is inherent in the offense. *Id.* at 272 (finding reliance on the end result of the defendant's action, the victim's death, was improper in the sentencing of the defendant for voluntary manslaughter). Here, death is not simply implicit, but an element of murder. See 720 ILCS 5/9-1(a) (West 2008) (stating "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death ***"). We note our recognition of the strong presumption sentencing courts have based their determinations on proper legal reasoning. *People v. Solis*, 2019 IL App (4th) 170084, ¶ 26, 138 N.E.3d 247. In reviewing defendant's sentence, we consider the record as a whole and do not focus on a few words or statements by the sentencing court. *Id.*

¶ 36      Before imposing defendant's sentence, the trial court stated the following regarding the aggravating factors of section 5-5-3.2(a) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(a) (West 2020)):

> "As to the factors in aggravation, well, we already know we have two individuals, one who died as a result of [defendant's] actions; another person who was seriously injured. The court certainly can take that into consideration. I can take his criminal history into consideration, the need for a deterrent that Macon County will not tolerate violence on two innocent victims who were doing nothing wrong. Those are all factors the court has to look at.
>
> This was a horrific act by individuals. Certainly, the court does take a look at that. This is a non-probationable offense, so, once again, that's not something the court has to even take into consideration."

¶ 37      Defendant has not met his burden of establishing the trial court committed clear error by applying an improper factor to aggravate defendant's sentence. While the trial court said it could take Newingham's death into consideration, it did not state it did so. The court's language does not show Newingham's death increased the length of defendant's sentence, but the court's other language showed great concern for the "horrific" nature of the attacks. Defendant has not established clear error occurred and, therefore, has not established plain error.

¶ 38                        B. Juvenile Sentencing Factors

¶ 39      Defendant next argues the trial court committed various errors when applying the

- 14 -

mitigating factors to be considered for youthful offenders and urges this court to follow the approach taken in *People v. McKinley*, 2020 IL App (1st) 191907, ¶¶ 86-89, 176 N.E.3d 166, and examine the manner in which the trial court weighed the sentencing factors. Among these errors, defendant contends the trial court improperly ruled out defendant's immaturity at the time of the offense as a mitigating factor based on his observations of defendant at this second trial, when defendant was 24 years old, and at the resentencing hearing, when defendant was 27 years old. Defendant further contends the trial court erred in finding peer pressure played no role in the offenses, in concluding his home environment had no influence on his actions, in giving little weight to defendant's rehabilitative potential, and in sentencing him to a 39½-year sentence.

¶ 40        The State counters by emphasizing the trial court expressly considered and applied each juvenile-sentencing factor. The State maintains our "analysis could (and frankly *should*) end there." The State likens defendant's argument of an improper application of juvenile-sentencing factors to purely an excessive-sentence argument and contends, therefore, we should give great discretion to the trial court's sentencing determination.

¶ 41        Sentencing courts have significant latitude in weighing factors in mitigation and aggravation when imposing sentence. See *People v. Solis*, 2019 IL App (4th) 170084, ¶ 23, 138 N.E.3d 247. Such decisions are reviewed for an abuse of discretion. *Id.* This court will find an abuse of sentencing discretion if the sentence is fanciful, arbitrary, or unreasonable. *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 28, 102 N.E.3d 761. We will further reverse a sentence that is "greatly at variance with the spirit and purpose of the law" (*People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000)) or, if the sentence falls within the statutory range, is "manifestly disproportionate to the nature of the offense" (*People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997)). However, the question of whether a factor was

improperly considered in aggravation or mitigation is reviewed *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65, 129 N.E.3d 755.

¶ 42 "[Y]outh matters in sentencing." *People v. Holman*, 2017 IL 120655, ¶ 33, 91 N.E.3d 849. This conclusion stems from a long line of United States Supreme Court cases including *Miller v. Alabama*, 567 U.S. 460, 489-90 (2012); *Roper v. Simmons*, 543 U.S. 551, 573 (2005); and *Graham v. Florida*, 560 U.S. 48, 68 (2010). The Supreme Court has found children are less culpable than adults based on ways they differ from adults: (1) children are less mature than adults and have an underdeveloped sense of responsibility, (2) children are more vulnerable than adults to negative influence and pressure from peers and family, and (3) a child's character is less fixed, meaning the conduct of the child is less likely indicative of irretrievable depravity. *Miller*, 567 U.S. at 471; see also *People v. Harris*, 2018 IL 121932, ¶ 55, 120 N.E.3d 900.

¶ 43 After *Miller*, and consistent with the United State Supreme Court cases, our General Assembly enacted section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West Supp. 2017)). This section mandates sentencing courts consider specific "factors in mitigation in determining the appropriate sentence" for individuals who were "under 18 years of age at the time of the commission of the offense." *Id.* The factors include the following:

> "(1) the person's age, impetuosity, and level of maturity at
> the time of the offense, including the ability to consider risks and
> consequences of behavior, and the presence of cognitive or
> developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure,
> including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and

social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West Supp. 2017).

¶ 44     We agree with the State's conclusion defendant's argument is essentially an excessive sentence argument that is entitled to our deference. Contrary to defendant's argument, this is not a case where we are asked whether the trial court considered an improper factor (see *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 72, 66 N.E.3d 601), as the trial court expressly addressed the correct sentencing factors, and none were "improper" factors. The court heard arguments from both sides, asserting the sentence could not exceed 40 years under *Buffer*,

2019 IL 122327, ¶¶ 36-42, and expressly considered and weighed each of the factors of section 5-4.5-105 before imposing a sentence of 31 years for murder and 8½ years for attempted murder. Instead, defendant is arguing the court gave improper weight to the factors and, in effect, imposed an excessive sentence.

¶ 45 When considering a challenge to the length of a sentence, we review a sentence that falls within the relevant sentencing range under the abuse-of-discretion standard. See *Lawson*, 2018 IL App (4th) 170105, ¶ 35. Defendant's sentence falls within the applicable sentencing range. Generally, murder has a sentencing range of 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2020)) with no eligibility for good-time credit (see 730 ILCS 5/3-6-3(a)(2)(i) (West 2020)). Attempted murder generally has a sentencing range of 6 to 30 years (720 ILCS 5/8-4(c)(1) (West 2008); 730 ILCS 5/5-4.5-25(a) (West 2020)), for which a defendant may receive up to 4½ days good-time credit per month served (730 ILCS 5/3-6-3(a)(2)(ii) (West 2020)). As both parties concede, the Illinois Supreme Court recently held good-time credit is considered in assessing whether a sentence is a *de facto* life sentence. *People v. Dorsey*, 2021 IL 123010, ¶ 50, 183 N.E.3d 715 (holding the sentence for a defendant of 76 years' imprisonment that was eligible for day-for-day good-conduct credit did not violate *Buffer*). Defendant is eligible to be released at almost 38¼ years.

¶ 46 It creates a potential issue when a sentencing judge refers to death when sentencing for murder. However, this death was caused by exceptionally brutal behavior. Trial judges should be careful in word choice and phrasing. In addition, the reference to defendant's maturity at his second trial and sentencing was not helpful. Yet, the court plainly was aware of defendant's age at the time of the offenses. The court weighed all factors before imposing the consecutive sentences of 31 years for murder and 8½ years for attempted murder. Given the

circumstances of the offenses, we do not find defendant's sentence to be fanciful, arbitrary, or unreasonable (*Lawson*, 2018 IL App (4th) 170105, ¶ 28) or "manifestly disproportionate to the nature of the offense" (*Franks*, 292 Ill. App. 3d at 779).

¶ 47                                   III. CONCLUSION

¶ 48          We affirm the trial court's judgment.

¶ 49          Affirmed.